United States Courts
Southern District of Texas
**FILED**

JUN 21 2018

David J. Bradley, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | Criminal No. |
| v. | § | |
| | § | |
| DR. PAULO BETTEGA, | § | UNDER SEAL   **18 CR 345** |
| COLIN WILSON, | § | |
| LINDELL KING, | § | |
| TIMOTHY HAYNES, and | § | |
| RAY MICHAEL GARCIA, | § | |
| | § | |
| Defendants. | § | |

**Sealed**
Public and unofficial staff access to this instrument are prohibited by court order.

### INDICTMENT

The Grand Jury charges:

### General Allegations

At all times material to this Indictment, unless otherwise specified:

1. The Medicare Program ("Medicare") was a federal healthcare program providing benefits to individuals who were the age of 65 or older, or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Medicare was a "healthcare benefit program" as defined by Title 18, United States Code, Section 24(b).

2. Medicare was subdivided into multiple Parts. Medicare Part B covered partial hospitalization programs ("PHPs") connected with the treatment of mental illness. The treatment program of PHPs closely resembled that of a highly structured, short-term hospital inpatient program, but it was a distinct and organized intensive treatment program that offered less than 24-hour daily care.

3. Patients eligible for Medicare coverage of a PHP comprised two groups: (1) those patients who were discharged from an inpatient hospital treatment program, and the PHP is in lieu of continued inpatient treatment; and (2) those patients who, in the absence of partial hospitalization, would require inpatient hospitalization.

4. Medicare guidelines required that patients admitted to a PHP require PHP services at levels of intensity and frequency comparable to patients in an inpatient setting for similar psychiatric illnesses.

5. Under the PHP benefit, Medicare covered the following services: (1) individual and group psychotherapy with physicians, psychologists or other mental health professionals; (2) occupational therapy requiring the skills of a qualified occupational therapist; (3) services of social workers, trained psychiatric nurses and other staff trained to work with psychiatric patients; (4) drugs and biologicals furnished for therapeutic purposes that could not be self-administered; (5) individualized activity therapies that were not primarily recreational or diversionary; (6) family counseling services for which the primary purpose was the treatment of the patient's condition; (7) patient education programs where the educational activities were closely related to the care and treatment of the patient; and (8) diagnostic services.

6. Medicare guidelines specifically excluded meals and transportation from coverage under the PHP benefit.

7. Medicare did not cover programs providing primarily social, recreational or diversionary activities. Medicare excluded from coverage programs attempting to maintain psychiatric wellness and treatment of chronic conditions without acute exacerbation. Psychosocial programs that provided only a structured environment, socialization or vocational rehabilitation were not covered by Medicare.

8. Medicare required that the PHP was provided at a facility that was based in or affiliated with a hospital or provided at a community mental health center ("CMHC").

9. Individuals who qualified for Medicare benefits were commonly referred to as Medicare "beneficiaries." Each beneficiary was given a Medicare identification number.

10. Hospitals, physicians and other healthcare providers that provided services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit an application in which the providers agreed to comply with all Medicare related laws and regulations. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number." A healthcare provider with a Medicare provider number could file claims with Medicare to obtain reimbursement for services rendered to beneficiaries.

11. Medicare paid hospitals and other healthcare providers for services rendered to beneficiaries. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare, either directly or through a billing company.

12. CMS contracted with Medicare Administrative Contractors ("MACs") to process claims for payment. The MAC that processed and paid Medicare Part B claims for PHP services in Texas was TrailBlazer Health Enterprises, LLC ("TrailBlazer") and Novitas Solutions, Inc. ("Novitas").

13. To bill Medicare for services rendered, a provider submitted a claim form (Form 1500) to TrailBlazer or Novitas. When a Form 1500 was submitted, usually in electronic form, the provider certified that: (1) the contents of the form were true, correct and complete; (2) the form was prepared in compliance with the laws and regulations governing Medicare; and (3) the contents of the claim were medically necessary.

14. A Medicare claim for PHP reimbursement was required to set forth the following, among other things: the beneficiary's name and unique Medicare identification number; the item or service provided to the beneficiary; the date the item or service was provided; the cost of the item or service; and the name and unique physician identification number of the physician who prescribed or ordered the item or service.

15. Behavioral Medicine of Houston PA ("BMH") located at 7830 Westglen Drive, Houston, Texas 77063 was a Medicare-certified Community and Mental Health Center ("CMHC"), which purported to provide PHP services to Medicare beneficiaries and billed Medicare for those services. BMH was an enrolled Medicare provider.

16. **DR. PAULO BETTEGA**, a resident of Fort Bend County, Texas, was the owner, director, and president of BMH. **DR. BETTEGA** was a medical doctor specializing in psychiatry. **DR. BETTEGA** was an enrolled Medicare provider and the Medicare-authorized/delegated official for BMH from at least in or about September of 2008 to in or about January of 2018.

17. **COLIN WILSON**, a resident of Harris County, Texas, operated group homes in the Houston, Texas area.

18. **LINDELL KING**, a resident of Fort Bend County, Texas, operated group homes in the Houston, Texas and surrounding areas. **KING** was a purported "driver" for BMH.

19. **TIMOTHY HAYNES,** a resident of Fort Bend County, Texas, operated group homes in Houston, Texas and surrounding areas along with Co-conspirator B. **HAYNES** was a purported "driver" for BMH.

20. **RAY MICHAEL GARCIA**, a resident of Harris County, Texas, recruited Medicare beneficiaries from group homes and other sources on the behalf of BMH, and assisted **DR. PAULO BETTEGA** in managing the day-to-day operations of BMH.

## COUNT 1

### Conspiracy to Pay and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

21. Paragraphs 1 through 20 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

22. From in or about March of 2010, through in or about January of 2017, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas, and elsewhere, defendants **DR. PAULO BETTEGA, LINDELL KING, COLIN WILSON, RAY MICHAEL GARCIA**, and **TIMOTHY HAYNES**, did knowingly and willfully combine, conspire, confederate and agree with each other, and others known and unknown to the grand jury, to commit certain offenses against the United States, that is,

    a. to violate Title 42, United States Code, Section 1320a-7b(b)(1), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare; and,

    b. to violate Title 42, United States Code, Section 1320a-7b(b)(2), by knowingly and willfully offering and paying remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and

recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

### Purpose of the Conspiracy

23. It was a purpose of the conspiracy for defendants **DR. PAULO BETTEGA, LINDELL KING, COLIN WILSON, TIMOTHY HAYNES, RAY MICHAEL GARCIA** their co-conspirators, and others to unlawfully enrich themselves by paying and receiving kickbacks and bribes in exchange for the referral of Medicare beneficiaries for whom BMH and **DR. PAULO BETTEGA** submitted claims to Medicare.

### Manner and Means of the Conspiracy

24. The manner and means by which defendants **DR. PAULO BETTEGA, LINDELL KING, COLIN WILSON, TIMOTHY HAYNES, RAY MICHAEL GARCIA**, their co-conspirators, and others sought to accomplish the purpose and object of the conspiracy included, among other things:

 a. Defendant **DR. PAULO BETTEGA** owned and managed BMH.

 b. Defendant **DR. PAULO BETTEGA** and his co-conspirators, maintained a Medicare Provider Number for BMH, which the defendant **DR. PAULO BETTEGA**, and his co-conspirators used to submit claims to Medicare for PHP services.

 c. Defendants **LINDELL KING, COLIN WILSON, TIMOTHY HAYNES**, Co-conspirator A, and Co-conspirator B, owned or operated group homes in the Houston, Texas and surrounding areas. Defendants and their co-conspirators would treat the residents of their group homes, who were most often Medicare or Medicaid beneficiaries, as a commodity. Defendants and their co-conspirators would use the Medicare beneficiaries residing at their group homes to receive money from individuals who would defraud Medicare. Those individuals included **DR. PAULO BETTEGA**.

6

d. Defendant **DR. PAULO BETTEGA, RAY MICHAEL GARCIA** his co-conspirators, and others paid illegal kickbacks to **LINDELL KING, COLIN WILSON, TIMOTHY HAYNES**, and their co-conspirators, and others, for the referral of Medicare beneficiaries for PHP services. The services were often medically unnecessary, and the Medicare beneficiaries often did not meet the Medicare qualifications for the services.

e. Defendant **DR. PAULO BETTEGA, RAY MICHAEL GARCIA, LINDELL KING, COLIN WILSON**, and **TIMOTHY HAYNES** and others, often disguised these illegal kickbacks as payments for transportation, cleaning, or other services, when the payments were in fact for the illegal referral of Medicare beneficiaries to receive Medicare-reimbursed PHP services from Defendant **DR. PAULO BETTEGA, RAY MICHAEL GARCIA**, their co-conspirators, and others.

f. Defendant **DR. PAULO BETTEGA** would incentivize Medicare beneficiaries to attend BMH to receive PHP services by waiving the Medicare-required copayments, and by offering free transportation, meals, and other incentives.

g. Additionally, Defendant **DR. PAULO BETTEGA** would incentivize group homeowners, including defendants **LINDELL KING**, and **COLIN WILSON**, to send their residents to BMH for PHP services, not only by paying them illegal kickbacks, but by providing free adult daycare for their group home residents.

h. Many of the Medicare beneficiaries attending BMH did not qualify, need, or want PHP services, but attended only because defendants **LINDELL KING, COLIN WILSON, TIMOTHY HAYNES**, their co-conspirators, and others required them to go as a condition of living at their group homes.

25. From in or around March of 2009 to in or around January of 2017, Defendants **DR. PAULO BETTEGA, RAY MICHAEL GARCIA, LINDELL KING, COLIN WILSON,**

7

TIMOTHY HAYNES, their co-conspirators, and others, submitted or caused the submission of approximately $26,445,833 in claims to Medicare for PHP and related services that they claimed that BMH purportedly provided to beneficiaries whose attendance at these hospitals and PHPs were induced by kickbacks. Defendants **DR. PAULO BETTEGA, LINDELL KING, COLIN WILSON, TIMOTHY HAYNES**, their co-conspirators, and others received approximately $14,491,876 on these claims.

### Overt Acts

26. In furtherance of the conspiracy, and to accomplish its object and purpose;

    a. Defendant **DR. PAULO BETTEGA** and his co-conspirators, maintained a Medicare Provider Number for BMH, which the defendant **DR. PAULO BETTEGA**, and his co-conspirators used to submit claims to Medicare for PHP services.

    b. On or about January 10, 2017, **DR. PAULO BETTEGA** authorized the payment of $750 ~~per week~~ *every two weeks* to defendant **COLIN WILSON** for the referral of **COLIN WILSON**'s group home residents to BMH

    c. On or about January 11, 2017, **DR. PAULO BETTEGA** certified that Medicare beneficiary C.P., a resident of **COLIN WILSON**'s group home, qualified for PHP services at BMH, knowing that C.P.'s attendance was secured by an illegal kickback.

    d. On or about May 11, 2017, defendant **LINDELL KING**, received approximately $700 cash from BMH in exchange for the referral of Medicare beneficiaries to BMH.

    e. On or about June 21, 2017, **LINDELL KING**, received approximately $1,500 from BMH in exchange for the referral of Medicare beneficiaries to BMH.

8

      f.     In or about June of 2017, **DR. PAULO BETTEGA** certified that Medicare beneficiary R.L.A., a resident of **LINDELL KING'S** group home, qualified for PHP services at BMH, knowing that R.L.A.'s attendance was secured by an illegal kickback.

      g.     On or about October 14, 2017, **TIMOTHY HAYNES** brought Medicare patients to BMH in order to receive illegal kickbacks.

**COUNTS 2 through 4**
**Anti-Kickback Statute**
**(42 U.S.C. § 1320a-7b(b), 18 U.S.C. § 2)**

27.    Paragraphs 1 through 26 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

28.    On or about the dates enumerated below, in Harris County, in the Southern District of Texas, and elsewhere, the Defendants **DR. PAULO BETTEGA, LINDELL KING, COLIN WILSON**, , aiding and abetting each other and aided and abetted by others, known and unknown to the Grand Jury, including Co-conspirator A, as set forth below, did knowingly and willfully offer and pay and did knowingly and willfully solicit and receive remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare:

| Count | Defendant | On or About Date | Approximate Amount of Kickback |
|---|---|---|---|
| 2 | **DR. PAULO BETTEGA** authorized payment to **COLIN WILSON** | January 10, 2017 | $750.00 |

9

| Count | Defendant | On or About Date | Approximate Amount of Kickback |
|---|---|---|---|
| 3 | **DR. PAULO BETTEGA** authorized payment to **LINDELL KING** | May 11, 2017 | $700.00 |
| 4 | **DR. PAULO BETTEGA** authorized payment to **LINDELL KING** | June 21, 2017 | $1,500.00 |

All in violation of Title 42, United States Code, Section 1320a-7b(b) and Title 18, United States Code, Section 2.

## CRIMINAL FORFEITURE
### (18 U.S.C. § 982(a)(7))

29. Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to Defendants **DR. PAULO BETTEGA, LINDELL KING, COLIN WILSON, RAY MICHAEL GARCIA,** and **TIMOTHY HAYNES**, that upon conviction, all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offense is subject to forfeiture.

Money Judgment

30. Defendants **DR. PAULO BETTEGA, LINDELL KING, COLIN WILSON, RAY MICHAEL GARCIA,** and **TIMOTHY HAYNES** are notified that upon conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture, which is *at least* $26,445,833.

Substitute Assets

31. Defendants **DR. PAULO BETTEGA, LINDELL KING, COLIN WILSON, RAY MICHAEL GARCIA,** and **TIMOTHY HAYNES** are notified that in the event that one or

more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of the Defendant up to the total value of the property subject to forfeiture.

A TRUE BILL

ORIGINAL SIGNATURE ON FILE
FOREPERSON


RYAN K. PATRICK
UNITED STATES ATTORNEY

JASON R. KNUTSON
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE